United States District Court
Southern District of Texas

**ENTERED**

June 30, 2026

Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


MARCUS LEVAIL MURPHY,                §
                                     §
            Petitioner,              §
                                     §
v.                                   §        CIVIL ACTION NO. H-25-3775
                                     §
ERIC GUERRERO,                       §
                                     §
            Respondent.              §


### MEMORANDUM OPINION AND ORDER


This case is before the Court on Petitioner Marcus Levail Murphy's petition for a writ of habeas corpus, Respondent Eric Guerrero's Answer, and Murphy's Response. Having carefully considered the petition, the answer, the response, all the arguments and authorities submitted by the parties, and the relevant record, the Court is of the opinion that Murphy's petition should be denied.

### I.    Background

Texas's Fourteenth Court of Appeals summarized the evidence:

> In the weeks leading up to her death, complainant Ebony Harris was romantically involved with [Murphy], who was then a member of the U.S. Navy living in the area around Chesapeake, Virginia. Less than a week

after learning she was pregnant with twins, Harris was found murdered in her Houston apartment. She had been strangled and repeatedly stabbed. There were defensive wounds on her hands, and [Murphy]'s DNA was under her fingernails.

\* \* \*

The evidence presented at trial showed that at around 2:00 a.m. on Thursday, February 19, 2015, Ebony Harris texted [Murphy], "OMG. I'm so scared." The response message from [Murphy]'s phone asked if Harris was okay. She answered, "No. I'm pregnant with twins." [Murphy], who had been dating Harris, lived at that time in Virginia with his wife and their children--also twins.

[Murphy] bought two pairs of gloves at a Wal-Mart in Danville, Virginia on the night of February 23, 2015, then drove to Charlotte International Airport, arriving at around 1:00 a.m. on February 24th. [Murphy] and his cousin then flew together to Houston with a layover in Detroit. They arrived at Bush Intercontinental Airport in Houston shortly after 11:00 a.m.

Data extracted from [Murphy]'s cell phone showed that [Murphy] arrived in the area around Harris's apartment at 11:56 a.m., about twenty minutes after Harris ended a phone call with her mother. There is no further user-generated activity from Harris's phone after this time.

Starting at around 12:40 p.m., there were incoming and outgoing calls between [Murphy]'s cell phone and a taxi service. An hour later, he arrived back at Intercontinental Airport. At 3:13 p.m., [Murphy] and his cousin boarded a flight back to Charlotte, Virginia by way of Atlanta.

Harris failed to appear for work at 2:00 p.m. as scheduled, and she did not contact her employer or her half-sister, who was babysitting Harris's four-year-old son.

2

The next day, that is, Wednesday, February 25, 2015, Harris's naked body was found face down in the master bedroom by a pest exterminator who had entered to treat the apartment. He informed the property manager, who phoned the police.

The first police officer arrived at around 2:30 p.m. and secured the scene. Sabrina Holden, a member of the Crime Scene Unit, photographed and diagrammed the scene. Police discovered Harris's phone under the bed in the master bedroom, where a struggle appeared to have taken place and where Harris's body was found. Police noted that two knives were missing from the knife block in the kitchen, and they found a knife in a kitchen cabinet.

Also on that day, [Murphy]'s phone shows that he searched Google for "Woman found in Greenspoint apartment," "Woman found dead in apartment in Houston today," and "February 24th, Houston woman found dead in apt."

Officer Richard Ridel, who was then working as a homicide detective, arrived at Harris's apartment at around 3:45 that afternoon. The apartment showed no signs of forced entry, which Ridel interpreted to mean that Harris had opened her door willingly. The apartment complex had surveillance cameras covering the apartment's front door, and although Ridel arranged to meet with the property's manager to recover the film, Ridel forgot to do so, and the film was overwritten after a week.

Meanwhile, on Thursday, February 26th, [Murphy]'s phone showed that he searched the internet for following:
• "Can police retrieve deleted text messages";
• "Can police pull flight manifests";
• "Can police pull travel records from airport";
• "Can police pull flight records";
• "Ebony Harris, Houston, Texas"; and
• "Woman found in Greenspoint."
Although Ridel initially assumed that Harris was

3

murdered on February 25th—the day her body was found—his investigation shifted to focus on February 24th after he learned that this was the date Harris last used her cell phone.

Harris's mother identified [Murphy] and five other men as people that Harris had been dating before her death. Ridel interviewed several of these men, who voluntarily gave Ridel buccal swabs of their DNA. Comparison of their DNA with DNA taken from Harris's twin embryos later revealed that Marlon Townsend, not [Murphy], fathered the twins.

Ridel obtained historical cell-tower data from that date for the men he was investigating. He also obtained flight records and [Murphy]'s credit-card records. The credit-card records showed [Murphy]'s purchase of two pairs of gloves in Virginia, and the cell-tower data and flight records showed [Murphy]'s movements, described above. DNA analysis of some of Harris's fingernail scrapings showed DNA of unknown origin, but for one particular scraping, the likelihood that the DNA present came from Harris, Harris's four-year-old son, and [Murphy] was "90.1 quattuordecillion times more likely than that the DNA was from Harris and two unknown unrelated individuals."

In a recorded phone interview with Ridel, [Murphy] denied being in Houston at all during the week that Harris was murdered, and the calls and texts between himself and Harris before her death had been deleted from his phone. That evidence remained, however, on Harris's phone.

Murphy v. State, No. 14-22-00836-CR, 2024 WL 2284326, at *1-2

(Tex. App. May 21, 2024), pet. ref'd (Sept. 25, 2024).

A jury found Murphy guilty of capital murder for the

4

murders of Harris and her unborn child.[1]  He was sentenced to life imprisonment without the possibility of parole.

## II.  **Applicable Legal Standards**

This federal petition for habeas relief is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 335-36 (1997).  Under the AEDPA federal habeas relief based upon claims that were adjudicated on the merits cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); Kitchens v. Johnson, 190 F.3d 698, 700 (5th Cir. 1999).

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  See 28 U.S.C.

---

[1]While the evidence showed that Harris was pregnant with twins, the indictment charged Murphy with the murder of Harris "and her unborn child." See Docket Entry No. 13-45 at 116.

§ 2254(d)(2); <u>Hill v. Johnson</u>, 210 F.3d 481, 485 (5th Cir. 2000). The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Jackson v. Anderson</u>, 112 F.3d 823, 824-25 (5th Cir. 1997).

## III. <u>Analysis</u>

Murphy raises four claims of ineffective assistance of counsel. To prevail on a claim for ineffective assistance of counsel, Murphy

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

<u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984). In order to prevail on the first prong of the <u>Strickland</u> test, Murphy must demonstrate that counsel's representation fell below an objective standard of reasonableness. <u>Id.</u> at 687-88. Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances. <u>Id.</u> at 688. Review of counsel's performance is deferential. <u>Id.</u> at 689. In assessing prejudice, "<u>Strickland</u> asks whether it is reasonably

likely the result would have been different," if not for counsel's deficient performance. Harrington v. Richter, 562 U.S. 86, 111 (2011)(internal quotation marks omitted).

### A.   Failure to Hire Expert Witness

Murphy first contends that his counsel rendered ineffective assistance by failing to hire Dr. Greg Hampikian as a DNA expert. Murphy attaches to his petition emails between Dr. Hampikian and Murphy's counsel discussing the possibility that Dr. Hampikian would be retained.   He further notes that the trial court approved $15,000 for retention of an expert.   He speculates that Dr. Hampikian would have testified that Murphy's DNA found under the victim's fingernails could have been transferred from Murphy's sweatshirt, which the victim was seen wearing, rather than during a struggle.   He identifies no such statement from Dr. Hampikian.

For a claim of uncalled witnesses to be meritorious, a habeas petitioner must show: (1) the testimony of the uncalled witnesses would have been favorable to him, and (2) the uncalled witness would have so testified during the proceeding.   Alexander v. McCotter, 775 F.2d 595, 605 (5th Cir.1985).   Further, "complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial

-7-

strategy and because allegations of what a witness would have testified are largely speculative." <u>Buckelew v. United States</u>, 575 F.2d 515, 521 (5th Cir.1978).

While Murphy shows that his counsel contacted Dr. Hampikian, he makes no showing that Dr. Hampikian would have given testimony supporting Murphy's theory that his DNA might have transferred to the victim from a sweatshirt.  Moreover, on cross examination, defense counsel got the State's DNA expert to concede that Murphy's DNA could have ended up under the victim's fingernails through innocuous means.  <u>See</u> Docket Entry No. 13-11 at 139-43.

Even if the Court were to assume that failing to retain Dr. Hampikian constituted deficient performance by counsel, Murphy fails to demonstrate <u>Strickland</u> prejudice.  Presentation of another hypothetical innocuous explanation for how Murphy's DNA ended up under the victim's fingernails would not eliminate the likelihood of a struggle in light of the evidence of Murphy's travel to and from Houston, cellphone data placing him near the murder scene at the time of the murder, and Murphy's incriminating behavior, including purchasing gloves and searching the internet for information about the murder and the availability of travel and cellphone evidence to the police.  In light of all the evidence, Murphy's sweatshirt theory is unlikely

-8-

to have changed the outcome of the trial.

**B.    <u>Failure to Object to Comments About DNA</u>**

During the State's opening statement, the prosecutor argued that the evidence would show that the victim's hands were cut because she put up a struggle.  Docket Entry No. 13-10 at 22.  A short while later, the prosecutor stated that evidence would show that Murphy's DNA was recovered from under the victim's fingernails "which proves that he had contact with her and most likely a struggle."  <u>Id.</u> at 24.  Murphy argues that counsel was ineffective for not objecting to this statement.

It is not clear that the statement was objectionable: The evidence adduced at trial did show that Murphy's DNA was found under the victim's fingernails, and the condition of her hands strongly suggested that she struggled with her attacker.  To the extent that Murphy contends the statement was improper argument, he cannot show prejudice.

As noted above, the non-DNA evidence of Murphy's guilt was extensive and damning.  An argumentative statement that was borne out by evidence, even if objectionable, did not swing the balance of the trial; even if counsel objected, there is little likelihood that it would have changed the outcome.  This claim is therefore without merit.

-9-

## C.    Failure to Challenge Admissibility of DNA Evidence

Murphy next argues that counsel should have moved to suppress the DNA evidence and sought a hearing under Kelly v. State, 824 S.W.2d 568 (Tex. Crim. App. 1992)(setting out standards for the admissibility of expert scientific evidence). Murphy contends that there was no way for the expert to determine how his DNA wound up under the victim's fingernails, and that the evidence was therefore unreliable.

Murphy offers nothing but his conjecture in support of this theory.  He therefore fails to demonstrate any likelihood that such objections would have been successful.  Counsel was not deficient for failing to raise meritless objections.

Moreover, even if the objections had been made and sustained, Murphy cannot show prejudice.  As discussed above, the non-DNA evidence of Murphy's guilt is overwhelming.  There is little doubt that Murphy would have been convicted even if no DNA evidence had been presented.  Murphy therefore fails to show Strickland prejudice.

## D.    The Cumulative Effect of Ineffective Assistance

Finally, Murphy argues that, even if none of his individual claims of ineffective assistance of counsel provides grounds for relief, the cumulative effect of these instances of allegedly

-10-

deficient performance do.  However, in the absence of any error, there is nothing to cumulate.

Even if counsel were deficient in any of the ways that Murphy claims, he cannot show prejudice.  Murphy's claims all revolve around the DNA evidence.  As recounted above, however, the non-DNA evidence showed that: Murphy learned that Harris was pregnant with twins; bought two pairs of gloves; booked two round trip tickets from Charlotte to Houston; flew to Houston on the day of the murder; was tracked by cellphone data to the victim's apartment complex around the time of the murder; flew back to Charlotte the same day, after the murder; deleted potentially incriminating texts from his cellphone; conducted internet searches about the murder and about the ability of the police to track his air travel and retrieve the deleted texts; and lied to the police about his presence in Houston on the day of the murder. In addition, the police were able to retrieve some of the incriminating texts from the victim's cellphone.  Even if all DNA evidence and all mention of DNA evidence had been suppressed, the evidence of Murphy's guilt was so overwhelming that the result of the trial would have been the same.  He therefore cannot show <u>Strickland</u> prejudice in his individual claims or cumulatively.

-11-

## IV.  Certificate of Appealability

Murphy has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings.  See Alexander v. Johnson, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA sua sponte.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.")  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.  See Whitehead v. Johnson, 157 F.3d 384, 388 (5th Cir. 1988); see also Hill v. Johnson, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone."  Lackey v. Johnson, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see also United States v. Kimler, 150

-12-

F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." Hernandez v. Johnson, 213 F.3d 243, 248 (5th Cir. 2000).  The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward:  The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  The issue becomes somewhat more complicated where . . . . the district court denies a habeas petition on procedural grounds. We hold as follows:  When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

Slack v. McDaniel, 529 U.S. 473, 484 (2000).

This Court has carefully considered Murphy's petition.  The Court finds that reasonable jurists would not find it debatable that Murphy's claims are without merit.  Murphy thus fails to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Court  therefore concludes

-13-

that Murphy is not entitled to a certificate of appealability.

## V.    Conclusion and Order

For the foregoing reasons, the Petition is **DENIED** and this action will be dismissed with prejudice.    No certificate of appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Order.

**SIGNED** at Houston, Texas, on this the 30th day of June, 2026.

SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE